[Crim. No. 22945. Dec. 5, 1985.]

In re WILLIAM G., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM G., Defendant and Appellant.

554

COUNSEL

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Paul James, Allan C. Oberstein, Eugene Moutes, Edward Rucker, William A. Misener, David P. Carleton and Henry J. Hall, Deputy Public Defenders, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab, Carol Wendelin Pollack, Susan Lee Frierson and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

Robert H. Philibosian, District Attorney (Los Angeles), Harry B. Sondheim and Donald J. Kaplan, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

REYNOSO, J.—William G. appeals from an order declaring him a ward of the juvenile court pursuant to section 602 of the Welfare and Institutions Code. This order was based on the court's finding that William unlawfully possessed marijuana for purposes of sale in violation of section 11359 of the Health and Safety Code. William was placed on probation for a period of three years.

The issue presented is one of first impression for this court: What standard is required under article I, section 13, of the California Constitution and the Fourth Amendment to the United States Constitution to determine the legality of a search by a public school official of a minor student? Given the unique characteristics of the school setting and the important responsibilities that school officials have to all students, we conclude that the applicable

standard is reasonable suspicion. We further conclude that the instant search did not meet the reasonable suspicion standard, requiring reversal of the trial court's judgment.

### I.

On the date of the alleged offense, October 1, 1979. William was 16 years of age and a student at Chatsworth High School in Los Angeles. At approximately 1:10 p.m., Reno Lorenz, the assistant principal at Chatsworth, noticed William and two other male students walking through the center of campus. The assistant principal was at that time approximately 35 yards away from the students. As Lorenz proceeded toward the students, he noticed that William was carrying a small black bag, later identified as a vinyl calculator case, to which the students' attention was momentarily drawn. The case had what Lorenz thought was an odd-looking bulge.

Upon reaching the students, Lorenz asked where they were heading and why they were late for class. William did not have any classes after 12 noon. As Lorenz spoke, William placed the case in a palmlike gesture to his side and then behind his back. Lorenz asked William what he had in his hand, to which William replied, "Nothing." When Lorenz attempted to see the case, William said "You can't search me," and then, "You need a warrant for this." Following more discussion, Lorenz took William by the arm and escorted him to the assistant principal's office.

Lorenz sought a noon recreational aide to act as a witness. After repeated unsuccessful efforts to convince William to hand over the case, Lorenz forcefully took and unzipped it. Inside were four baggies of marijuana weighing a total of less than one-half ounce, a small metal gram weight scale, and some Zigzag cigarette papers. William stated that he was holding the contents of the case for someone else.

Lorenz immediately telephoned the police. Los Angeles Police Officer Stephen Henderson responded and placed William under arrest. The officer conducted a pat-down search for weapons and any additional contraband, and found $135 in William's pockets. This money was never introduced into evidence.

At the adjudication hearing William, through his attorney, moved to suppress the evidence obtained from his calculator case on the ground that the search was conducted illegally. William argued that public school officials should be subject to the constitutional proscriptions against unreasonable searches and seizures and that there was no reasonable basis for the instant search.

At the hearing Lorenz testified that he was employed by the Los Angeles City Board of Education and that his duties as assistant principal included assisting the school security agent, whom he supervised, in arresting juveniles for narcotics violations. He testified that it was usual for him to call in the police after making such arrests. While Lorenz had no prior information which led him to believe that William was in possession of marijuana, or that William had otherwise violated the law or a school rule, it was his standard procedure to question students who were not in class during regular class periods. Lorenz further testified that he would have called the school security agent, rather than the recreational aide, to assist him in searching William but the agent was not on duty that day. Officer Henderson testified that he had previously arrested many Chatsworth students for narcotics violations who had been turned over by Lorenz and the school security agent.

The juvenile court denied William's motion to suppress, based on a finding that the search conducted by Lorenz was reasonable under the circumstances, and that Lorenz would have been derelict in his duties had he not "done what he did." On appeal, William contends this ruling is reversible error.

William claims that Lorenz is a government agent to whom the constitutional limitations on searches and seizures should apply; that while searches conducted solely for school purposes may be subject to a reasonable suspicion standard, searches which are conducted for the purpose of juvenile adjudication or criminal prosecution must be based on probable cause; that the search conducted by Lorenz was not supported by probable cause or reasonable suspicion; and, therefore, that the evidence obtained by Lorenz is inadmissible under the exclusionary rule. The People argue that searches of students on public school grounds need be supported by only a "reasonable suspicion," even if conducted for law enforcement purposes, and that the search conducted by Lorenz met this standard.

## II.

■ It is well settled that minor students are "persons" under our state and federal Constitutions and therefore possess fundamental constitutional rights which the state must respect. (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 511 [21 L.Ed.2d 731, 740, 89 S.Ct. 733].) "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as adults, are

protected by the Constitution and possess constitutional rights."[1] (*Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52, 74 [49 L.Ed.2d 788, 808, 96 S.Ct. 2831].)

■ Among these rights is the guarantee of freedom from unreasonable searches and seizures contained in the Fourth Amendment to the United States Constitution and article I, section 13, of the California Constitution. (*In re Scott K.* (1979) 24 Cal.3d 395, 400-403 [155 Cal.Rptr. 671, 595 P.2d 105], cert. den., 444 U.S. 973 [62 L.Ed.2d 388, 100 S.Ct. 468].) As we have previously noted, this guarantee is inferable from minors' constitutional rights to privacy,[2] and their guarantee under the Fourteenth Amendment against deprivation of liberty without due process of law.[3] (*In re Scott K.*, supra, 24 Cal.3d 395, 401, 402.)[4]

As noted above, this court has not previously considered the scope of Fourth Amendment[5] protections that should be accorded minors subject to

[1]For example, the United States Supreme Court has held that minors are constitutionally entitled to freedom of speech and expression (*Tinker* v. *Des Moines School Dist.*, supra, 393 U.S. 503; *Board of Education* v. *Barnette* (1943) 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674]); equal protection against racial discrimination (*Brown* v. *Board of Education* (1954) 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686]); and due process before being suspended from school (*Goss* v. *Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729]).

[2]See *Planned Parenthood of Missouri* v. *Danforth*, supra, 428 U.S. 52 (upholding minor's right to an abortion without parental consent); and *Carey* v. *Population Services International* (1977) 431 U.S. 678 [52 L.Ed.2d 675, 97 S.Ct. 2010] (upholding minor's right to obtain contraceptives).

[3]The United States Supreme Court has held that minors facing criminal charges in juvenile proceedings are constitutionally entitled to notice, counsel, confrontation and cross-examination of witnesses, and protection against self-incrimination (*In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 523, 87 S.Ct. 1428]); are protected against coerced confessions (*Gallegos* v. *Colorado* (1962) 370 U.S. 49 [8 L.Ed.2d 325, 82 S.Ct. 1209, 87 A.L.R.2d 614]); that the Fifth Amendment prohibition against double jeopardy precludes criminal prosecution of a juvenile subsequent to commencement of juvenile court adjudication involving the same offense (*Breed* v. *Jones* (1975) 421 U.S. 519 [44 L.Ed.2d 346, 95 S.Ct. 1779]); and that proof of guilt beyond a reasonable doubt is required in delinquency adjudications (*In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]).

[4]Accord, *Brown* v. *Fauntleroy* (D.C. Cir. 1971) 442 F.2d 838, 840-841; *In re Harvey* (1972) 222 Pa.Super. 222 [295 A.2d 93, 96-97]; *In re Morris* (1971) 29 Ohio Misc. 71 [278 N.E.2d 701, 702]; *Ciulla* v. *State* (Tex.Civ.App. 1968) 434 S.W.2d 948, 950; *In re Williams* (1966) 49 Misc.2d 154, 169-170 [267 N.Y.S.2d 91].)

[5]We rest our decision on both state and federal law. Unless otherwise indicated, references to the Fourth Amendment are also intended to refer to article I, section 13, of the California Constitution. Similarly, the federal cases upon which we rely are intended to also support certain aspects of the independent state grounds of our decision, as the federal cases prescribe the minimum standards that may not be violated. (See *In re Scott K.*, supra, 24 Cal.3d at pp. 400-401.) "This court has always assumed the independent vitality of our state Constitution. In the search and seizure area our decisions have often comported with federal law, yet there has never been any question that this similarity was a matter of choice and not compulsion." (*People* v. *Brisendine* (1975) 13 Cal.3d 528, 548 [119 Cal.Rptr. 315, 531

searches by public school officials. ■ ■ While we recognize that the constitutional rights of minors need not always be coextensive with those of adults,[6] it is well established that public school students do not shed their constitutional rights upon reaching the schoolhouse door. (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 506 [21 L.Ed.2d 731, 737].) "The authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards." (*Goss* v. *Lopez, supra,* 419 U.S. 565, 574 [42 L.Ed.2d 725, 734].)

### III.

■ The Fourth Amendment's protection against unreasonable searches and seizures applies only to governmental action. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 487 [29 L.Ed.2d 564, 595, 91 S.Ct. 2022].) The origin and history of the Fourth Amendment "clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies . . . ." (*Burdeau* v. *McDowell* (1921) 256 U.S. 465, 475 [65 L.Ed. 1048, 1051, 41 S.Ct. 574, 13 A.L.R. 1159]; see also *Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 100 [73 Cal.Rptr. 575, 447 P.2d 967].) Thus, while the protection of the Fourth Amendment is not limited to action by law enforcement, but extends to all governmental action (see *New Jersey* v. *T.L.O.* (1985) 469 U.S. 325 [83 L.Ed.2d 720, 730, 105 S.Ct. 733, 740]), it does not extend to searches conducted by private persons.

■ Our initial determination is therefore whether public school officials such as Lorenz are agents of the government to whom the constitutional proscriptions against unreasonable searches and seizures apply. Consistent with the United States Supreme Court's recent ruling in *New Jersey* v. *T.L.O., supra,* that public school officials are subject to the Fourth Amendment's proscription against unreasonable searches and seizures, we con-

---

P.2d 1099]; see also art. I, § 24, Cal. Const.: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution.") We are not concerned in this case with the application of article I, section 28, subdivision (d), of the California Constitution (Prop. 8, Primary Elec. (June 8, 1982)), as the instant search was conducted before the effective date of that provision. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149].)

[6]See *In re Scott K., supra,* 24 Cal.3d 395, 401, and *In re Roger S.* (1977) 19 Cal.3d 921, 928 [141 Cal.Rptr. 298, 569 P.2d 1286]. Minors' rights may be legitimately restricted to serve the state's interest in promoting the health and welfare of children. (*Prince* v. *Massachusetts* (1944) 321 U.S. 158, 168 [88 L.Ed. 645, 653-654, 64 S.Ct. 438].) "[E]ven where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults'." (*Ginsberg* v. *New York* (1968) 390 U.S. 629, 638 [20 L.Ed.2d 195, 203, 88 S.Ct. 1274] quoting *Prince* v. *Massachusetts, supra,* 321 U.S. 158, 170 [88 L.Ed 645, 654].)

clude that California public school officials are further subject to this proscription under article I, section 13, of the California Constitution.

The state Court of Appeal to first consider this issue concluded that public school officials are private persons and therefore outside the scope of the Fourth Amendment. In the case of *In re Donaldson* (1969) 269 Cal.App.2d 509 [75 Cal.Rptr. 220], marijuana seized by a high school vice principal pursuant to a warrantless search of a student's locker was held admissible in a subsequent juvenile proceeding. The court found the vice principal to be a nongovernmental agent because "the primary purpose of the school official's search was not to obtain convictions, but to secure evidence of student misconduct." (*Id.,* at p. 511.)[7] The court relied on the in loco parentis responsibility of school officials to maintain discipline upon school premises. (*Id.,* at p. 513.) Although noting that the "acquisition of property by a private citizen from another person cannot be deemed reasonable or unreasonable," the court determined "[t]hat [because] evidence of crime is uncovered and prosecution results therefrom should not of itself make the search and seizure unreasonable." (*Id.,* at pp. 511-512.)[8]

We find this reasoning and the conclusion that public school officials are not governmental agents untenable on two grounds. First, public school officials are clearly agents of the government by the very nature of their employment. They are employees of the state through its local school boards (Ed. Code, §§ 1040 et seq., 14000 et seq., 41000 et seq., and 45020 et seq.).[9] Their qualifications, licensing and certification are controlled by state statute (§ 44000 et seq.). They are accountable to the State Board of Edu-

---

[7]The *Donaldson* court explicitly found "no joint operation by police and the school official" in that case. (*Id.,* at p. 511.) This finding apparently played an insignificant role in the court's determination that public school officials are private persons for purposes of the Fourth Amendment, but was critical to its determination of whether such cooperative efforts by a school official, whom the court otherwise perceived to be a private person, are thereby "tainted with state action [which] consequently violate the Fourth Amendment's prohibition." (*Ibid.*) While we believe that the existence of formal cooperative activities between law enforcement and public school officials in effecting searches of minor students may be an important consideration in determining the standard to be applied to these activities under the Fourth Amendment (see fn. 12, *post*), we do not find this inquiry relevant to the initial determination of whether this constitutional provision applies.

[8]Relevant Court of Appeal decisions since *Donaldson* have similarly continued to determine the reasonableness of searches by public school officials. (See, *In re Christopher W.* (1973) 29 Cal.App.3d 777, 780-782 [105 Cal.Rptr. 775] [explicit application of Fourth Amendment, although adopted *Donaldson* view that public school officials are not governmental officials]; *In re Fred C.* (1972) 26 Cal.App.3d 320, 323-326 [102 Cal.Rptr. 682] [assumed sub silentio that Fourth Amendment applies]; *In re Thomas G.* (1970) 11 Cal.App.3d 1193, 1196-1199 [90 Cal.Rptr. 361] [explicit application of Fourth Amendment].) None of these decisions addressed the inherent conflict in applying both the Fourth Amendment and the *Donaldson* holding that school officials are not governmental officials.

[9]All further statutory references are to the Education Code unless otherwise noted.

cation (§ 33000 et seq.) to implement state-prescribed policies and curricula (§§ 51000 et seq., 8000 et seq.). Moreover, public school officials are charged with the education and supervision of children whose education is primarily funded by the state (§§ 14000 et seq., 41000 et seq.). These children, if between the ages of 6 and 16 and not within an exempted class, are compelled by the state to attend school (§ 48200 et seq.); their conduct is statutorily circumscribed (§§ 48900 et seq., 44807); and their discipline by school officials must conform to state statute (§ 49000 et seq.). The very nature of these responsibilities renders public school officials agents of our state and local governments.

The second basis for rejecting the *Donaldson* court's conclusion that school officials are private persons for purposes of the Fourth Amendment is that court's reliance on the in loco parentis doctrine. At common law, this doctrine was based on the individual delegation of parental authority to the private tutor or schoolmaster of one's child. This delegation was "such a fraction of the power of the parent committed to his charge, viz., that of restraint and correction, as may be necessary to answer the purposes for which he is employed." (1 Blackstone's Commentaries 453.)

An overemphasis of this doctrine ignores the realities of modern public school education. It can no longer be said that parents voluntarily delegate a portion of their authority to school officials, as parents are required under penalty of criminal sanctions to enroll their children in school (§ 48291). Moreover, the common law doctrine of in loco parentis has given way in this state to a statutory directive.[10] Thus, public school officials act pursuant to statutory or governmental, rather than privately delegated, authority. As the United States Supreme Court reasoned, "[t]oday's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly mandated educational and disciplinary policies . . . In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents . . ." (*New Jersey* v. *T.L.O., supra,* 469 U.S. 325 [83 L.Ed.2d at p. 731, 105 S.Ct. at p. 741].) (See also *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530, 533-538 [208 Cal.Rptr. 657].)

---

[10]Section 44807 provides: "Every teacher in public schools shall hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess. A teacher, vice principal, principal or any other certificated employee of a school district shall not be subject to criminal prosecution or criminal penalties for the exercise, during the performance of his duties, of the same degree of physical control over a pupil that a parent would be legally privileged to exercise but which in no event shall exceed the amount of physical control reasonably necessary to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning. The provisions of this section are in addition to and do not supersede the provisions of Section 49000 [governing scope of permissible disciplinary actions]."

Finally, that public school officials are governmental agents is underscored by the United States Supreme Court's application to such officials of constitutional restraints relevant only to state action. (See, e.g., *Tinker, supra,* 393 U.S. 503 [First Amendment]; *Goss* v. *Lopez, supra,* 419 U.S. 565 [due process clause of the Fourteenth Amendment].) "If school authorities are state actors for purposes of the constitutional guarantees of freedom of expression and due process, it is difficult to understand why they should be deemed to be exercising parental rather than public authority when conducting searches of their students." (*New Jersey* v. *T.L.O., supra,* 469 U.S. 325 [83 L.Ed.2d at p. 731, 105 S.Ct. at p. 741].) As the Supreme Court has stated, "[t]he Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." (*Board of Education* v. *Barnette, supra,* 319 U.S. at p. 637 [87 L.Ed. at p. 1637].)

Given these considerations, we conclude that public school officials are governmental agents within the purview of both the Fourth Amendment and article I, section 13, and must therefore respect the constitutional rights of students in their charge against unreasonable searches and seizures.[11]

---

[11]Accord, *State* v. *Baccino* (Del.Super. 1971) 282 A.2d 869, 870-871 [49 A.L.R.3d 973]; *People* v. *Scott D.* (1974) 34 N.Y.2d 483 [358 N.Y.S.2d 403, 315 N.E.2d 466, 468]; *Doe* v. *State* (1975) 88 N.M. 318 [540 P.2d 827, 831]; *State* v. *Walker* (1974) 19 Ore.App. 420 [528 P.2d 113, 115]; *State* v. *Mora* (La. 1975) 307 So.2d 317, 319, vacated and remanded (1975) 423 U.S. 809 [46 L.Ed.2d 29, 96 S.Ct. 20], modified 330 So.2d 900, certiorari denied 429 U.S. 1004 [50 L.Ed.2d 616, 97 S.Ct. 538]. See also Comment, *Students and the Fourth Amendment: "The Torturable Class"* (1983) 16 U.C. Davis L.Rev. 709, 713-714.

Justice Mosk's dissent mistakenly concludes that our opinion equates public school officials with peace officers. It is precisely because we do not equate these two types of governmental officials that we have concluded that a standard of suspicion less than probable cause must apply to searches by officials of the public schools. The distinction we draw between public school officials and peace officers is underscored by our refusal to now decide what standard should apply in determining the reasonableness of searches by school officials who act in cooperation with law enforcement officers. (See fns. 7, *ante,* and 12, *post.*)

As earlier noted, the proscriptions of the Fourth Amendment are not properly limited to agents of law enforcement. As the United States Supreme Court has recognized in the administrative law context, "the Fourth Amendment prohibition against unreasonable searches protects against warrantless intrusions during civil as well as criminal investigations . . . If the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." (*Marshall* v. *Barlow's, Inc.* (1978) 436 U.S. 307, 312-313 [56 L.Ed.2d 305, 311, 98 S.Ct. 1816].) "The basic purpose of this [Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by *governmental* officials." (Italics added.) (*Camara* v. *Municipal Court* (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727].)

Justice Mosk's characterization of our holding is rather attenuated. It is not generally the responsibility of governmental secretaries, librarians, gardeners or janitors to keep a vigilant and watchful eye over public school students. Nor is it their duty to conduct searches of such students when needed to ensure the students' health and safety. However, if these governmental employees worked for a public school and conducted student searches, they

## IV.

■ We next consider what standard should apply in determining the reasonableness of searches by public school officials.[12] As will be seen, we conclude that the unique characteristics of the school setting require that the applicable standard be reasonable suspicion. The governmental interests in providing an environment which will protect the health and welfare of all students must be balanced with the privacy interests of individual students. ■ ■ ■ ■ That weighing process convinces us that the standard is appropriately less than probable cause.[13]

---

would then be held to the same constitutional standard we have established for all public school officials. Additionally, in evaluating the reasonableness of the instant search without determining that the Fourth Amendment applies, the dissent makes the same analytical error as prior Court of Appeal decisions. (See fn. 8, *ante.*)

[12]Under the facts of this case, we do not reach the issue of what standard should apply where law enforcement officials are involved at the outset of a student search, or where a school official acts in cooperation with, or as an agent of, law enforcement. (See fn. 7, *ante;* cf., e.g., *Picha* v. *Wieglos* (N.D.Ill. 1976) 410 F.Supp. 1214, 1219-1221 [school officials' cooperative efforts with law enforcement held to require probable cause to search].) Nor do we adopt the distinction, urged by William and initially drawn in *Donaldson,* between searches conducted solely for school purposes and searches resulting in, or conducted for the purpose of, juvenile adjudication or criminal prosecution.

[13]An overview of the Fourth Amendment's general application and exceptions places our discussion in context. The Fourth Amendment protects "the people" against "unreasonable searches and seizures" by governmental officials. Under ordinary circumstances, a search is per se unreasonable unless conducted pursuant to a judicial warrant issued on the basis of probable cause and describing with particularity the items to be seized. (*United States* v. *Place* (1983) 462 U.S. 696, 701 [77 L.Ed.2d 110, 701-702, 103 S.Ct. 2637, 2641].) Probable cause depends upon facts and circumstances which are reasonably trustworthy and sufficient to warrant a prudent person to believe that a violation of law is being, or has been, committed. (*Beck* v. *Ohio* (1964) 379 U.S. 89, 91 [13 L.Ed.2d 142, 145, 85 S.Ct. 223].)

This general rule is subject to "a few specifically established and well-delineated exceptions." (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507].) These exceptions include searches incident to a lawful arrest (*Illinois* v. *Lafayette* (1983) 462 U.S. 640 [77 L.Ed.2d 65, 103 S.Ct. 2605, 2608-2609]); searches made under exigent circumstances (*United States* v. *Jeffers* (1951) 342 U.S. 48, 52 [96 L.Ed. 59, 64, 72 S.Ct. 93]); where the police are in "hot pursuit" (*Warden* v. *Hayden* (1967) 387 U.S. 294, 298-300 [18 L.Ed.2d 782, 787-788, 87 S.Ct. 1642]); pursuant to a "stop and frisk" for weapons (*Terry* v. *Ohio* (1968) 392 U.S. 1, 30 [20 L.Ed.2d 889, 911, 88 S.Ct. 1868]); where the evidence is in plain view (*Coolidge* v. *New Hampshire, supra,* 403 U.S. 443, 465-468 [29 L.Ed.2d 564, 582-584]); or with the consent of the individual whose person or property is searched (*Zap* v. *United States* (1946) 328 U.S. 624, 628-630 [90 L.Ed. 1477, 1481-1483, 66 S.Ct. 1277]).

The warrant and probable cause requirements have also been relaxed for searches conducted in unique settings, such as military installations (*United States* v. *Grisby* (4th Cir. 1964) 335 F.2d 652); at the national border (*United States* v. *Jaime-Barrios* (9th Cir. 1974) 494 F.2d 455, cert. den. 417 U.S. 972 [41 L.Ed.2d 1143, 94 S.Ct. 3178]); aboard vessels within the United States or its coastal waters (*United States* v. *Villamonte-Marquez* (1983) 462 U.S. 579 [77 L.Ed.2d 22, 103 S.Ct. 2573]); pursuant to certain administrative inspections of licensed businesses (*United States* v. *Biswell* (1972) 406 U.S. 311 [32 L.Ed.2d 87, 92 S.Ct. 1593]); or at the situs of other regulated activities (*Camara* v. *Municipal Court, supra,* 387 U.S. 523, but see *Donovan* v. *Dewey* (1980) 452 U.S. 594, 606-607 [69 L.Ed.2d 262, 273-274, 101 S.Ct. 2534]).

■ The right of privacy is vitally important. It derives, in this state, not only from the protections against unreasonable searches and seizures guaranteed by the Fourth Amendment and article I, section 13, but also from article I, section 1, of our state Constitution. Homage to personhood is the foundation for individual rights protected by our state and national Constitutions. ■ The privacy of a student, the very young or the teenager, must be respected. By showing that respect the institutions of learning teach constitutional rights and responsibilities by example. "That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." (*Board of Education* v. *Barnette, supra,* 319 U.S. at p. 637 [87 L.Ed. 1628, 1637].)

At the same time, the right of all students to a school environment fit for learning cannot be questioned. Attendance is mandatory and the aim of all schools is to teach. Teaching and learning cannot take place without the physical and mental well-being of the students. The school premises, in short, must be safe and welcoming. As the Fifth Circuit Court of Appeals stated in *Horton* v. *Goose Creek Ind. Sch. Dist.* (5th Cir. 1982) 690 F.2d 470, 480, certiorari denied 463 U.S. 1207 [77 L.Ed.2d 1387, 103 S.Ct. 3536]: "When society requires large groups of students, too young to be considered capable of mature restraint in their use of illegal substances or dangerous instrumentalities [to congregate in the public schools], it assumes a duty to protect them from dangers posed by anti-social activities—their own and those of other students—and to provide them with an environment in which education is possible. To fulfill that duty, teachers and school administrators must have broad supervisory and disciplinary powers." (Fn. omitted.)

The public school setting is one in which governmental officials are directly in charge of children and their environs, including where they study, eat and play. Thus, students' zones of privacy are considerably restricted as compared to the relation of a person to the police—whether on the street or at home. Further, the responsibility of school officials for each of their charges, the children, is heightened as compared to the responsibility of the police for the public in general. Thus, the approaches of the law, including constitutional law, must vary. That they must vary in no wise means that student privacy interests are less important or that school officials may be less sensitive to them. Thus, a student always has the highest privacy interests in his or her own person, belongings, and physical enclaves, such as lockers.

The balancing of competing interests to determine the scope of Fourth Amendment protections in a particular setting is well settled. ■

Whether a particular search is reasonable depends on a balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." (*United States* v. *Place, supra,* 462 U.S. 696, 703 [77 L.Ed.2d 110, 118 103 S.Ct. 2637, 2642].) ▮ In balancing students' privacy interests with the governmental interests in promoting a safe learning environment, we conclude that searches of students by public school officials must be based on a reasonable suspicion that the student or students to be searched have engaged, or are engaging, in a proscribed activity (that is, a violation of a school rule or regulation, or a criminal statute). There must be articulable facts supporting that reasonable suspicion. Neither indiscriminate searches of lockers nor more discreet individual searches of a locker, a purse or a person, here a student, can take place absent the existence of reasonable suspicion. Respect for privacy is the rule—a search is the exception.

In sum, this standard requires articulable facts, together with rational inferences from those facts, warranting an objectively reasonable suspicion that the student or students to be searched are violating or have violated a rule, regulation, or statute. (Cf. *People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436], and *In re Tony C.* (1978) 21 Cal.3d 888, 893-894 [148 Cal.Rptr. 366, 582 P.2d 957] [investigative detentions]; *Terry* v. *Ohio, supra,* 392 U.S. 1, 21-22 [20 L.Ed.2d 889, 905-906] [stop and frisk for weapons].) The corollary to this rule is that a search of a student by a public school official is unlawful if predicated on mere curiosity, rumor, or hunch. (Cf. *In re Tony C., supra,* at p. 893.)

This standard is consistent with that recently adopted by the United States Supreme Court in *New Jersey* v. *T.L.O.:* "Under ordinary circumstances, a search of a student by a teacher or other school official will be 'justified at its inception' when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." (469 U.S. 325 [83 S.Ct. at pp. 734-735, 105 S.Ct. at p. 744], fns. omitted.) ▮ We also adhere to the court's limitations on the scope of permissible searches under this standard: "Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." (*Ibid.,* fn. omitted.)

▮ Like the United States Supreme Court, we do not require that school officials obtain a warrant before conducting the types of searches herein described. "The warrant requirement . . . is unsuited to the school environment: requiring a teacher to obtain a warrant before searching a

child suspected of an infraction of school rules (or of the criminal law) would unduly interfere with the maintenance of the swift and informal disciplinary procedures needed in the schools." (469 U.S. 325 [83 S.Ct. at p. 733, 105 S.Ct. at p. 743].)

 A majority of courts in other jurisdictions have also adopted a standard of suspicion lower than probable cause in order to determine the legality of a student search by a public school official. (See *Bilbrey* v. *Brown* (9th Cir. 1984) 738 F.2d 1462, 1466; see also Comment, *supra,* 16 U.C. Davis L.Rev. 709, 723.) While the standard adopted by most of these decisions is "reasonable suspicion,"[14] some courts have adopted the standard of "reasonable cause to believe" (see, e.g., *M.* v. *Bd. of Ed. Ball-Chatham C.U.S.D. No. 5* (S.D.Ill. (1977) 429 F.Supp. 288, 292), "reasonable grounds to believe" (see, e.g., *State in the Interest of T.L.O., supra,* 463 A.2d 934, 941-942), or simply require that the search be "reasonable" (see, e.g., *State* v. *Young* (1975) 234 Ga. 488, 496, 498 [216 S.E.2d 586], cert. den. 423 U.S. 1039 [46 L.Ed. 413, 96 S.Ct. 576]). While most of these decisions balance the interests of the student against in loco parentis responsibilities of school officials,[15] we prefer, for the reasons previously discussed, to view these countervailing governmental interests as statutorily, rather than common law, based.[16] (Accord, *State* v. *Mora, supra,* 307 So.2d

---

[14]See, e.g., *Bellnier* v. *Lund* (N.D.N.Y. 1977) 438 F.Supp. 47, 53-54; *Nelson* v. *State* (Fla.App. 1975) 319 So.2d 154, 156; *Doe* v. *State, supra,* 540 P.2d 827, 832; *State* v. *Baccino, supra,* 282 A.2d 869, 872; *People* v. *Jackson* (1971) 65 Misc.2d 909 [319 N.Y.S.2d 731, 733-736]. Cf. *State* v. *Mora, supra,* 307 So.2d 317, 320 (applying full Fourth Amendment protections).

[15]See, e.g., *M.* v. *Bd. of Ed. Ball-Chatham C.U.S.D. No. 5, supra,* 429 F.Supp. at page 292; *Bellnier* v. *Lund, supra,* 438 F.Supp. 47, 53-54; *Nelson* v. *State, supra,* 31 So.2d 154, 156; *State* v. *Baccino, supra,* 282 A.2d 869, 872; *People* v. *Jackson, supra,* 319 N.Y.S.2d 731, 733-736.

[16]As discussed earlier, the in loco parentis doctrine has been used to underscore the responsibility of school officials to maintain order and discipline in the school and to insure the health, morals, and safety of all students. (See, e.g., *In re Donaldson, supra,* 269 Cal.App.2d 509, 512-513; *In re Christopher W., supra,* 29 Cal.App.3d 777, 780-782.) However, under the doctrine at common law, the disciplinary powers delegated to the schoolmaster were limited to the individual child and not, as many courts have assumed, to the protection of the entire student body. (See, Buss, *The Fourth Amendment and Searches of Students in Public Schools* (1974) 59 Iowa L.Rev. 739, 768.) Moreover, the in loco parentis doctrine cannot be extended to justify searches by school officials which would not be legal although approved by a parent. (*In re Scott K., supra,* 24 Cal.3d 395, 404-405; see also dis. opn. by Justice Hughes in *Mercer* v. *State* (Tex.Civ.App. 1970) 450 S.W.2d 715, 720-721.)

Finally, the in loco parentis doctrine was apparently not meant to apply to criminal conduct:

"The Latin phrase [parens patriae] proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic credentials are of dubious relevance. The phrase was taken from chancery practice, where, however, it was used to describe the power of the state to act *in loco parentis* for the purpose of protecting the property interests and the person of the child.

317, 319; *Doe* v. *State, supra,* 540 P.2d 827; *People* v. *Ward* (1975) 62 Mich.App. 46 [233, N.W.2d 180]; *Horton* v. *Goose Creek Ind. Sch. Dist., supra,* 690 F.2d 470, 480-481, fn. 18.)

The reasonable suspicion standard is more stringent than other "less than probable cause" standards for public school searches because it depends on objective and articulable facts. We thus reject those standards previously articulated by this state's Courts of Appeal (see *In re Thomas G., supra,* 11 Cal.App.3d 1193, 1196, 1199 ["reasonable"] and *In re Fred C., supra,* 26 Cal.App.3d 320, 324, 326 ["good cause"]), including the two-prong test apparently applied the instant case: "The first requirement is that the search be within the scope of the school's duties. The second requirement is that the action taken, the search, be reasonable under the facts and circumstances of the case." (*In re Christopher W., supra,* 29 Cal.App.3d 777, 782.)

### V.

 Finally, we must determine whether the search conducted by Lorenz met the standard of reasonable suspicion.

Lorenz articulated no facts to support a reasonable suspicion that William was engaged in a proscribed activity justifying a search. The record reflects a complete lack of *any prior* knowledge or information on the part of Lorenz relating William to the possession, use, or sale of illegal drugs or other contraband. (Accord, *Bilbrey* v. *Brown, supra,* 738 F.2d at pp. 1467, 1468; cf., *In re Donaldson, supra,* 269 Cal.App.2d 509 [student informant made purchase of illegal drugs from defendant at direction of school official]; *In re Thomas G., supra,* 11 Cal.App.3d 1192 [student informed school official that he had seen defendant ingest illegal drug and was acting "intoxicated"]; *In re Fred C., supra,* 26 Cal.App.3d 320 [student informant told school official that defendant was selling illegal drugs on campus]; and *In re Christopher W., supra,* 29 Cal.App.3d 777 [four students informed school official that defendant's locker contained a sack of marijuana].) Lorenz' suspicion that William was tardy or truant from class provided no reasonable basis for conducting a search of any kind. The record is also devoid of evidence of exigent circumstances requiring an immediate nonconsensual search.

---

But there is no trace of the doctrine in the history of criminal jurisprudence." (*In re Gault, supra,* 387 U.S. at p. 16 [18 L.Ed.2d at p. 540].)

As this court has previously stated, "California law has long imposed on school authorities a duty to 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection. [Citations.]' " (*Dailey* v. *Los Angeles Unified Sch. District* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360], quoting *Taylor* v. *Oakland Scavenger Co.* (1941) 17 Cal.2d 594, 600 [110 P.2d 1044].)

Moreover, William's "furtive gestures" in attempting to hide his calculator case from Lorenz' view cannot, standing alone, furnish sufficient cause to search. (See *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 817-818 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; *Sibron* v. *New York* (1968) 392 U.S. 40, 66-67 [20 L.Ed.2d 917, 937, 88 S.Ct. 1889].) Similarly, William's demand for a warrant did not create a reasonable suspicion upon which to base the search. Such conduct merely constitutes William's legitimate assertion of his constitutional right to privacy and to be free from unreasonable searches and seizures. There are many reasons why a student might assert these rights, other than an attempt to prevent disclosure of evidence that one has violated a proscribed activity. A student cannot be penalized for demanding respect for his or her constitutional rights. (Cf. *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].) If a student's limited right of privacy is to have any meaning, his attempt to exercise that right—by shielding a private possession from a school official's view—cannot in itself trigger a "reasonable suspicion." A contrary conclusion would lead to the anomalous result that a student would retain a right of privacy only in those matters that he willingly reveals to school officials.

We therefore conclude that Lorenz' search of William's calculator case was conducted illegally, and that the evidence obtained thereby was inadmissible in the proceedings of the juvenile court. (See *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513]; *Mapp* v. *Ohio* (1960) 367 U.S. 643, 655 [6 L.Ed.2d 1081, 1090, 81 S.Ct. 1684, 84 A.L.R.2d 933].)[17]

---

[17]The United States Supreme Court did not need to decide whether the exclusionary rule applies to the fruits of unlawful searches conducted by school authorities since it concluded that the search of T.L.O. was legally valid. (See 469 U.S. 325 fn. 3 [83 L.Ed.2d at p. 729, 105 S.Ct. at p. 739].) However, the court properly noted that "[t]he question whether evidence should be excluded from a criminal proceeding involves two discrete inquiries: whether the evidence was seized in violation of the Fourth Amendment, and whether the exclusionary rule is the appropriate remedy for the violation." (*Ibid.*)

Having concluded that the evidence in the instant case was seized in violation of the Fourth Amendment and article I, section 13, we further determine that the exclusionary rule is the only appropriate remedy for this violation when, as in the instant case, the evidence is sought to be admitted in a juvenile or criminal prosecution. (Cf. *Gordon J.* v. *Santa Ana Unified School Dist., supra,* 162 Cal.App.3d at pp. 542-546 [holding that the exclusionary rule does not apply to school disciplinary proceedings, an issue not presented by the case at bar].) The exclusionary rule is intended not only to have a deterrent effect on police misconduct, but to preserve the integrity of the judicial system. "When, as in the present case, the very purpose of an illegal search and seizure is to get evidence to introduce at a trial, the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. It is no answer to say that a distinction should be drawn between the government acting as law enforcer and the gatherer of evidence and the government acting as judge." (*People* v. *Cahan, supra,* 44 Cal.2d at p. 445.) As the United States Supreme Court has said, the exclusionary rule "gives to the individual no more than that which the Constitution guarantees him, to the police officer no less than that to which honest law

The order of the superior court declaring appellant a ward of the juvenile court pursuant to section 602 of the Welfare and Institutions Code is reversed.

Broussard, J., Grodin, J., and Kaus, J.,* concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately to express my own views on this important issue.

## I.

I cannot join in the abandonment of traditional Fourth Amendment analysis which today's majority opinion embraces. Both the balancing test employed by my colleagues and the "reasonable suspicion" standard which they ultimately enunciate are at odds with well-established search and seizure doctrine.

This court should, under the state constitutional search and seizure provision (art. I, § 13), adhere to the standard of probable cause in the school setting. The reasonable suspicion standard should be the standard only where the intrusion by the school official falls substantially short of a full-scale search or seizure. (See *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957].)

As Justice William Brennan so aptly observed in his dissent in *New Jersey* v. *T.L.O.* (1985) 469 U.S. 325, 357 [83 L.Ed.2d 720, 745, 105 S.Ct. 733, 752], to "cast aside the constitutional probable-cause standard when assessing the constitutional validity of a schoolhouse search . . . on the basis of [a] Rohrschach-like 'balancing test[]' . . . represents a sizable innovation in Fourth Amendment analysis.

"This innovation finds support neither in precedent nor policy and portends a dangerous weakening of the purpose of the Fourth Amendment to protect the privacy and security of our citizens. Moreover, even if this Court's historic understanding of the Fourth Amendment were mistaken and a balancing test of some kind were appropriate, any such test that gave adequate weight to the privacy and security interests protected by the Fourth Amendment would not reach the preordained result [of reasonableness which] the Court's conclusory analysis reaches today." I stand with Justice

---

enforcement is entitled, and, to the courts, that judicial integrity so necessary in the true administration of justice." (*Mapp* v. *Ohio, supra,* 367 U.S. at p. 660 [6 L.Ed.2d at p. 1093].)

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

Brennan's view. I would require the search in this case to be evaluated under the probable cause standard.

## II.

I recognize full well that Justice Brennan's position was rejected by the majority in *T.L.O.* and is rejected by today's majority in favor of a "reasonable suspicion" standard. It is gratifying that in enunciating that standard, my colleagues require that reasonable suspicion be directed toward a specific student. (Majority opn., *ante,* at p. 564.)

A rule requiring individualized suspicion discourages searches of a group, class, or entire student body where the school official has reasonable suspicion that there has been a violation of the law but is unable to focus that suspicion on a particular individual. The constitutional rights of the many do not automatically disappear simply because there are reasonable grounds for violating the constitutional rights of one. "Our state and federal Constitutions were written precisely to outlaw . . . unrestricted general sweeps and searches." (*People* v. *Aldridge* (1984) 35 Cal.3d 473, 480 [198 Cal.Rptr. 538, 674 P.2d 240].)

An "individualized suspicion" rule is fully consistent with the philosophy of the detention cases (*Aldridge, supra,* 35 Cal.3d 473; *People* v. *Loewen* (1983) 35 Cal.3d 117 [196 Cal.Rptr. 846, 672 P.2d 436]; *In re Tony C., supra,* 21 Cal.3d 888) on which the majority opinion bases its holding. (Majority opn., *ante,* at p. 564.) Those decisions require that a temporary detention be based on evidence that activity relating to crime has taken place or is occurring or about to occur, *and* that "*the person [whom the officer] intends to stop or detain is involved in that activity.*" (*Id.,* at p. 893, italics added.) Thus, the doctrinal underpinnings of the "reasonable suspicion" standard enunciated today provide ample response to this very important question.

Moreover, although the *T.L.O.* court declined to decide this question, it hinted strongly that individualized suspicion would be required even under the Fourth Amendment. "Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field." ' [Citation.]" (*T.L.O., supra,* 469 U.S. at p. 342, fn. 8 [83 L.Ed. at p. 735, 105 S.Ct. at p. 744].)

The need for such a rule is poignantly demonstrated by a school search conducted only 10 days after the decision in *T.L.O.* was announced. This incident was described by Nat Hentoff in a recent article in the Village

Voice. (Hentoff, *The Day the Girls of Elyria Were Strip-Searched* (June 18, 1985) The Village Voice, at p. 25.)

After finishing first-period gym class at the Westwood Junior High School in Elyria, Ohio, one of the girls in the class told her teacher that her watch and ring—which she thought she had left in the locker room—were missing. Acting on what the school superintendent would later claim was " 'reasonable deliberation of the critical issues at hand,' " the gym teacher proceeded to search the lockers and purses of each of the 20 girls in the class, without success. Two other female school officials then joined the gym teacher in conducting a body search of each student, again without producing the stolen goods. The local newspaper criticized the action, observing that " '. . . Theft is serious business—but to ask 20 girls to take off most of their clothing in the hope that one guilty party will be found, goes beyond common sense, and is an affront to the innocent. . . .' " (*Id.,* at p. 25, col. 3.) The requirement of individualized suspicion may very well prevent such offensive intrusions from occurring on our school campuses.

In this case, even though Lorenz had an individualized suspicion, it is clear that his search of William's calculator case was predicated on neither probable cause nor reasonable suspicion. Therefore, the evidence seized was erroneously admitted and the order of wardship cannot stand. For this reason, I concur.

**MOSK, J.**—I dissent.

I do not quarrel with the "reasonable suspicion" test adopted by the majority, but I cannot subscribe to their grounds for that holding or their disposition of this appeal. As will appear, I would rely instead on an interpretation of the duties imposed by statute on school officials, and I would find there clearly was reasonable suspicion on this record. Thus there is no need to reverse and remand the matter to the juvenile court.

My colleagues rely on two bases for their conclusion. First, they equate school officials with peace officers; second, they overrule a controlling Court of Appeal decision because it relies on the doctrine of in loco parentis. I believe they err on both points.

The majority stress that "public school officials are governmental agents" by the very nature of their employment. (*Ante,* p. 560.) True. Of course public school officials work for the government. But so do the secretary who types this opinion, the librarian who catalogues our law books, the gardener who tends the courthouse lawn, the janitor who cleans the building in which this court sits, and, in California, more than 200,000 other state employees. The test is not whether a person gets a paycheck from a gov-

ernment agency; the test is whether that person is an agent of *law enforcement* and subject to the restraints imposed on peace officers.

It is untenable to deem the hundreds of thousands of federal, state, and local government employees to be agents of law enforcement. One becomes a law enforcement agent only when directly assigned to so act by authorized personnel, or when one volunteers to serve. In the absence of such an assignment by direction or by choice, school teachers and officials have no obligation to adhere to the rules governing law enforcement or to protect criminal defendants.

The majority reject the well-reasoned opinion in *In re Donaldson* (1969) 269 Cal.App.2d 509 [75 Cal.Rptr. 220], and its progeny (e.g., *In re Guillermo M.* (1982) 130 Cal.App.3d 642 [181 Cal.Rptr. 856] (hg. den.); *In re Christopher W.* (1973) 29 Cal.App.3d 777 [105 Cal.Rptr. 775]; *In re Fred C.* (1972) 26 Cal.App.3d 320 [102 Cal.Rptr. 682]; *In re Thomas G.* (1970) 11 Cal.App.3d 1193 [90 Cal.Rptr. 361]) because of reliance on the doctrine of in loco parentis, which, they suggest, "ignores the realities of modern public school education." In fact, their quarrel is not with those who fail to recognize such "realities," but with the Legislature of the State of California.

Regardless of how it fares elsewhere, the basic doctrine of in loco parentis is not dead in California. (Accounts of its demise in *Gordon J.* v. *Santa Ana Unified School Dist.* (1984) 162 Cal.App.3d 530 [208 Cal.Rptr. 657], are, as Mark Twain would have put it, grossly exaggerated.) The concept is alive and well, and is codified by the Legislature in Education Code section 44807. In loco parentis means, precisely, "in the place of a parent" (Black's Law Dict. (4th ed. 1951) p. 896); it originated in the text of Blackstone's Commentaries.

Section 44807 provides that teachers, vice principals, and other certificated employees of a school district may exercise *"the same degree of physical control over a pupil that a parent would be legally privileged to exercise . . . ."* (Italics added.) In other words, the enumerated employees of a school district stand in loco parentis—in place of the parent—for purposes of physical control on school grounds, in order "to maintain order, protect property, or protect the health and safety of pupils, or to maintain proper and appropriate conditions conducive to learning." (*Ibid.*) In the same section, the Legislature has required that "Every teacher in the public schools shall hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess."

Although, as indicated above, school officials are not law enforcement agents, they have the foregoing statutory duties. Implicit in their obligation to maintain order, protect school property, and protect the health and safety

of pupils, is the right of school officials to search pupils and their property on reasonable suspicion of misconduct and a sincere belief that the search is necessary to maintain "conditions conducive to learning." Such searches "Primarily . . . are not undertaken in any law enforcement capacity but are designed to allow enforcement of multiple rules, regulations and prohibitions which are imposed to maintain an atmosphere of security and calm necessary to allow education to take place. This may and does involve controlling students' behavior, and it may and does involve controlling the deleterious items they are allowed to possess on the premises." (*State* v. *Young* (1975) 234 Ga. 488 [216 S.E.2d 586, 592] cert. den. *sub nom. Young* v. *Georgia* (1975) 423 U.S. 1039 [46 L.Ed.2d 413, 96 S.Ct. 576].)

The majority in the instant case create a dilemma for school officials. If the authorities vigilantly protect their classrooms and school grounds from students' improper conduct, they are likely to run afoul of the majority's expansive concept of unlawful searches; yet if they fail to act diligently, they assume the risk of civil liability. This court held in *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360], that "California law has long imposed on school authorities a duty to 'supervise at all times the conduct of the children on the school grounds and to enforce those rules and regulations necessary to their protection.' " Inadequate supervision was held to justify tort liability.

The reliance of the majority on the opinion of Justice White in *New Jersey* v. *T.L.O.* (1985) 469 U.S. 325, 327 [83 L.Ed.2d 720, 725, 105 S.Ct. 733, 736], is puzzling. First of all, it was a plurality opinion; it did not command a clear majority.[1] Second, the court held the search of the schoolgirl and her possessions was justified, and affirmed the admission of the evidence and the conviction. From that result, the majority here should draw little comfort.

In upholding the search and conviction, the plurality opinion in *T.L.O.* made it clear that public school officials "act in furtherance of publicly mandated educational and disciplinary policies" and statutes "establishing the authority of school officials over their students." (*Id.* at p. 336 [83 L.Ed.2d at p. 731, 105 S.Ct. at p. 741].) As I relate above, our Legislature has likewise made clear California's publicly mandated educational and disciplinary policies.

Justices Powell and O'Connor, while concurring in the majority result, added this significant caveat: "The special relationship between teacher and

---

[1] One problem with the *T.L.O.* analysis is its apparent underlying assumption that many high school pupils are now adults, since the lowering of the age of majority. What the opinion unfortunately overlooks is that delinquent and criminal conduct among juveniles often begins in the lower grades of high school, in middle school, and even in elementary school.

student also distinguishes the setting within which school children operate. Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between school authorities and pupils. Instead, there is a commonality of interests between teachers and their pupils. The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education.

"The primary duty of school officials and teachers, as the Court states, is the education and training of young people. A state has a compelling interest in assuring that the schools meet this responsibility. Without first establishing discipline and maintaining order, teachers cannot begin to educate their students. And apart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers themselves from violence by the few students whose conduct in recent years has prompted national concern. For me, it would be unreasonable and at odds with history to argue that the full panoply of constitutional rules applies with the same force and effect in the schoolhouse as it does in the enforcement of criminal laws." (Fn. omitted; *id.* at p. 350 [83 L.Ed.2d at p. 740, 105 S.Ct. at p. 748].)

On the other hand, if evidence should disclose that a school official was working at the direction of, in cooperation with, or under the authority of law enforcement officers, the exclusionary rule would apply. (See, e.g., *Dyas* v. *Superior Court* (1974) 11 Cal.3d 628, 633, fn. 2 [114 Cal.Rptr. 114, 522 P.2d 674].) There was no such evidence in this case; indeed, the evidence is to the contrary.

Here, the vice principal acted after seeing three students on the school grounds at a time when they should presumably have been in a classroom. When approached, the minor involved herein attempted to conceal a bag he was holding and refused to permit the school official to examine it or its contents. The boy's conduct was comparable to that of the girl in *T.L.O.* The vice principal promptly took the minor to his office, called in an observer because he feared the minor might flee, and proceeded to investigate further. Only after finding what appeared to be marijuana in the bag did he call law enforcement officials. It was among the vice principal's usual duties to ascertain whether students who were not in class possessed the necessary permission to be elsewhere. He testified that his routine responsibilities involved "Supervision basically more than security per se."

The vice principal was thus clearly acting in a supervisory role and pursuant to his statutory authority when he stopped the minor and proceeded to investigate. The latter's evasive responses and evident recalcitrance gave

him reasonable suspicion justifying the search. There was no evidence that the vice principal acted in furtherance of law enforcement goals. His concerns and actions were fully appropriate to and consistent with his position as a school official. Indeed, they were consistent with the concerns and actions of the school authorities in *T.L.O.*

Of course we must be alert to protecting the legitimate rights of students who are suspected of criminal activity or violation of school regulations. However, we must also realize that innocent, law-abiding students have a constitutional right to protection from crime and criminals, and are entitled to a safe school environment. The people of California made that clear when they adopted article I, section 28, subdivision (c), of the Constitution: it provides that "All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful." In addition, the Code of Ethics of the Teaching Profession provides that the teacher "protects the health and safety of students." (Cal. Admin. Code, tit. 5, § 80130.) This is both a moral duty and a legal obligation.

The majority opinion in this case will arouse apprehension and cause uncertainty in communities and in school districts. We live in troublesome, indeed hazardous, times. A decade or two ago the potential delinquent pupil was merely truant, smoked cigarettes, and drove hot rod cars. Today the delinquent of the same age is often violent, and some use drugs and deadly weapons.

If we are not to have countless future generations of adult criminals, we must make as certain as possible that we do not permit criminality to begin with juveniles in public schools. We do not have police officers in our classrooms. We do not have parents in our classrooms. Therefore we must give to teachers and principals all the tools they reasonably need to preserve order in classrooms and school grounds.

The juvenile court did not err in denying the motion to suppress the evidence. I would affirm its adjudication of wardship.