[No. D056026. Fourth Dist., Div. One. Dec. 22, 2010.]

In re SEAN A., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
SEAN A., Defendant and Appellant.

**COUNSEL**

Jason L. Nienberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf ˙ and Marissa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HUFFMAN, Acting P. J.**—The juvenile court declared Sean A. a ward of the court (Welf. & Inst. Code, § 602) and placed him on probation after Sean admitted to possessing a controlled substance for sale in violation of Health and Safety Code section 11378.

Sean appeals, contending that the juvenile court erred by denying his motion to suppress evidence obtained as a result of a search of his person by a public high school official premised on the fact that he left and returned to campus during the school day. Sean also challenges one of the conditions of his probation.

We conclude that the search was lawful, and that Sean has waived any objection to his probation conditions by failing to object in the juvenile court.

## FACTUAL AND PROCEDURAL BACKGROUND

Sean, who was a student at a public high school, was observed by an attendance clerk as he was returning to campus in the middle of the school day. The assistant principal reviewed Sean's attendance record for the day and noticed that Sean had been absent from his period 1 and 2 classes, present for his period 3 class, and then absent from his period 4 class.

The high school conducts searches of students who leave campus and then return during the school day. Specifically, the school's written policy, set forth in the behavior code section of the school's student handbook, states that "students who return to campus after being 'out-of-bounds' are subject to a search of their person, their possessions, and vehicle when appropriate."[1] The assistant principal testified, "I search every student who leaves campus and comes back." He stated that the purpose of the rule is to "keep students that are on campus safe" and to ensure that "nobody's bringing anything on campus they shouldn't."

Having determined from Sean's attendance record that he had left and returned to campus, the assistant principal called Sean to his office. Sean told the assistant principal that he went home to retrieve a notebook.

The assistant principal asked Sean to empty out the contents of his pockets. One of Sean's pockets held a plastic bag containing 44 pills of methylenedioxymethamphetamine (commonly known as MDMA or Ecstasy). After being arrested, Sean apparently told police that he left campus to pick up the pills and had sold some of them on the way back to campus.[2]

---

[1] The handbook states that "[o]ut-of-bounds areas include, but are not limited to: parking lots, bike, moped and motorcycle parking areas, athletic fields, private property and areas surrounding the campus." During annual school registration, students and their parents sign an acknowledgement that they have read the school's behavior code.

[2] In the absence of any evidence in the record of Sean's statements to the police, we rely on a remark in the district attorney's opposition to Sean's motion to suppress and on a comment in the probation officer's report as the basis for our recital of Sean's statements to the police.

A petition was filed against Sean in juvenile court under Welfare and Institutions Code section 602, alleging (1) unlawful possession of a controlled substance for the purpose of sale; and (2) unlawful possession of a controlled substance.

Sean brought a motion to suppress the evidence obtained as a result of the assistant principal's search of him, contending that the search was unlawful. After hearing the testimony of the assistant principal and receiving exhibits, including a handbook setting forth the high school's policies, the juvenile court denied the motion to suppress, stating that it believed the high school's policy of searching students who left and returned to campus was "in line with the Constitution" and did not "effectively deny students on campus . . . the right to be free from search or seizure."

Sean subsequently admitted to possessing a controlled substance for sale in violation of Health and Safety Code section 11378. The district attorney dismissed the simple possession count, and the juvenile court placed Sean on probation.

## DISCUSSION

### I

### THE SEARCH OF THE MINOR WAS PROPER

#### A. Standard of Review

On appeal from a ruling denying a motion to suppress evidence, we "exercise our independent judgment to determine whether, on the facts found by the court, the search was reasonable under the Fourth Amendment [of the United States Constitution]." (*In re Lisa G.* (2004) 125 Cal.App.4th 801, 805 [23 Cal.Rptr.3d 163].) If any findings of fact are challenged, we apply a substantial evidence standard of review. (*Ibid.*)

■ The Fourth Amendment protects students on a public school campus against unreasonable searches and seizures. (*In re Randy G.* (2001) 26 Cal.4th 556, 567 [110 Cal.Rptr.2d 516, 28 P.3d 239]; *In re William G.* (1985) 40 Cal.3d 550, 561 [221 Cal.Rptr. 118, 709 P.2d 1287].) However, strict application of the principles of the Fourth Amendment as used in criminal law enforcement matters does not appropriately fit the circumstances of the operation of the public schools. The need to maintain discipline, provide a safe environment for learning and prevent the harmful impact on the students and staff of drugs and weapons cannot be denied.

Our Supreme Court in *In re Randy G.*, described the societal interest in safe schools in compelling terms. The court stated: "The governmental interest at stake is of the highest order. '[E]ducation is perhaps the most important function of state and local governments.' (*Brown v. Board of Education* (1954) 347 U.S. 483, 493 [98 L.Ed. 873, 74 S.Ct. 686].) 'Some modicum of discipline and order is essential if the educational function is to be performed.' (*Goss v. Lopez* [(1975) 419 U.S. 565, 580 [42 L.Ed.2d 725, 95 S.Ct. 729]].) School personnel, to maintain or promote order, may need to send students into and out of classrooms, define or alter schedules, summon students to the office, or question them in the hall. Yet, as the high court has observed, school officials 'are not in the business of investigating violations of the criminal laws . . . and otherwise have little occasion to become familiar with the intricacies of this Court's Fourth Amendment jurisprudence.' (*Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 623 [103 L.Ed.2d 639, 109 S.Ct. 1402].) Those officials must be permitted to exercise their broad supervisory and disciplinary powers, without worrying that every encounter with a student will be converted into an opportunity for constitutional review. To allow minor students to challenge each of those decisions, through a motion to suppress or in a civil rights action under 42 United States Code section 1983, as lacking articulable facts supporting reasonable suspicion would make a mockery of school discipline and order." (*In re Randy G., supra*, 26 Cal.4th at p. 566.)

In *New Jersey v. T. L. O.* (1985) 469 U.S. 325 [83 L.Ed.2d 720, 105 S.Ct. 733] (*T.L.O.*), the court recognized the legitimate needs of schools to maintain a safe environment. The court there, dealing with an individualized search of a student who had been seen smoking in the restroom, found that the requirement for probable cause as applied to law enforcement would be inappropriate for the school environment. The court declared that reasonable suspicion on the part of administrators was sufficient to meet the demands of the Fourth Amendment. The court recognized the applicability of the "special needs" exception to the general principles of the Fourth Amendment jurisprudence applied to the public school environment. (469 U.S. at p. 333.)

The Court of Appeal in *In re Latasha W.* (1998) 60 Cal.App.4th 1524, 1527 [70 Cal.Rptr.2d 886] (*Latasha W.*), aptly summarized the school cases. "The school cases just cited are part of a larger body of law holding that 'special needs' administrative searches, conducted without individualized suspicion, do not violate the Fourth Amendment where the government need is great, the intrusion on the individual is limited, and a more rigorous standard of suspicion is unworkable. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646 [132 L.Ed.2d 564, 115 S.Ct. 2386] [upholding random drug testing of student athletes]; *Michigan Dept. of State Police v. Sitz* (1990) 496 U.S. 444 [110 L.Ed.2d 412, 110 S.Ct. 2481] [upholding random sobriety checkpoints designated to locate drunk drivers]; *Skinner*[, *supra*,] 489 U.S.

602 [upholding postaccident drug testing of railroad employees]; *Treasury Employees v. Von Raab* (1989) 489 U.S. 656 [103 L.Ed.2d 685, 109 S.Ct. 1384] [upholding suspicionless drug testing of customs officials]; *United States v. Martinez-Fuerte* (1976) 428 U.S. 543 [49 L.Ed.2d 1116, 96 S.Ct. 3074] [upholding vehicle stops at fixed checkpoints to search for illegal aliens]; *Camara v. Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] [upholding searches of residences by housing code inspectors].)" (*Latasha W., supra,* at p. 1527.)

The court in *Latasha W.* dealt with a search process different than that employed in *T.L.O., supra,* 469 U.S. 325. The minor in *Latasha W., supra,* 60 Cal.App.4th 1524, was searched as part of a suspicionless search for weapons. The school district in that case developed a policy of random weapons screening with a handheld metal detector. The policy was written and made known to both students and parents.

On the particular day that the minor in *Latasha W.* was searched the principal had determined that those students who entered the attendance office without hall passes and those who were late within a half-hour after 8:09 a.m. would be searched. The minor in *Latasha W.* was one of eight to 10 students who met these criteria and were searched. After the metal detector beeped she was asked to open her pockets, revealing a knife. (*Latasha W., supra,* 60 Cal.App.4th at p. 1526.)

■ The Court of Appeal in *Latasha W.* found the search to be reasonable stating: "The need of schools to keep weapons off campuses is substantial. Guns and knives pose a threat of death or serious injury to students and staff. The California Constitution, article I, section 28, subdivision (c), provides that students and staff of public schools have 'the inalienable right to attend campuses which are safe, secure and peaceful.'" (*Latasha W., supra,* 60 Cal.App.4th 1524 at p. 1527.) The court there found the search minimally intrusive subject to a system designed to prevent the influx of weapons into the school environment.

B. *The Search Was Legal*

The search in this case was conducted pursuant to an established policy. Every student who leaves the campus and then returns is subject to search upon return. The students and their parents receive notice of the policy as part of the school's behavior code. The search in this case was carried out without touching the student, who was required only to empty his pockets. The assistant principal testified the purpose of the search policy is to keep the school environment safe.

While the record in this case is limited as compared to those in the civil rights cases of *Vernonia School Dist. 47J v. Acton, supra,* 515 U.S. 646

(*Vernonia*) and *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls* (2002) 536 U.S. 822 [153 L.Ed.2d 735, 122 S.Ct. 2559] (*Pottawatomie*), it is sufficient here to permit an informed analysis of the policy and its purposes. Plainly the purpose of the policy is to prevent students who have left and returned in violation of the school rules from bringing in harmful objects such as weapons or drugs like those discovered in the current case.

■ As observed by both the United States Supreme Court and the California Supreme Court, school administrators have a responsibility to provide a safe learning environment for the students as well as a safe workplace for the staff.

In our view the policy at issue in this case is similar to that approved by the court in *Latasha W., supra,* 60 Cal.App.4th 1524. It also serves the same purpose as the drug testing requirements approved by the United States Supreme Court in both *Vernonia, supra,* 515 U.S. 646 and *Pottawatomie, supra,* 536 U.S. 822.

The minor and our dissenting colleague take a different approach to the analysis of the search in this case. The minor argues this case involves an individualized search and therefore the search must be supported by reasonable suspicion as defined by the court in *T.L.O., supra,* 469 U.S. 325. We disagree.

*T.L.O., supra,* 469 U.S. 325, involved a student who was reported for smoking in the restroom, a fact the student adamantly denied. The individualized search that followed was for the purpose of resolving the specific factual issues unique to *T.L.O.* on that particular date. In the present case, however, it is clear that the policy underlying the search is applied to all students who leave and then return to school in violation of the school's attendance rules. The purpose of the search is to prevent the introduction of harmful items into the school environment. Much like the drug testing, a far more intimate intrusion, approved in *Vernonia, supra,* 515 U.S. 646 and *Pottawatomie, supra,* 536 U.S. 822, this is not a process that requires individualized suspicion.

We are also influenced in our analysis by the limited nature of the search that took place. The search was restricted to requiring the student to empty his pockets or open his backpack. The student was not subjected to physical touching of his person nor was he exposed to the intimate process required for a urine sample necessary for drug testing.

■ In sum, the search in this case was consistent with the type of action on the part of a school administrator that falls well within the definition of

"special needs" of a governmental agency as we have outlined in the case law above. Given the general application of the policy to all students engaged in a form of rule violation that can easily lend itself to the introduction of drugs or weapons into the school environment, we conclude that further individualized suspicion was not required. Accordingly, we find the trial court correctly denied the motion to suppress evidence.

## II

### THE MINOR HAS FORFEITED ANY CHALLENGE TO THE CONDITIONS OF PROBATION

After he admitted the violation alleged in the petition, the court placed Sean on probation. One of the conditions of the grant of probation was condition 11 which states: "Minor shall attend school unless officially excused from school attendance; obey the rules and conditions of the school, maintain passing grades and satisfactory citizenship. Minor shall show proof of attendance or other school records whenever requested by the Probation Officer."

Sean did not object to any of the conditions of probation, but instead agreed to abide by the conditions. He now contends for the first time on appeal that this court should strike condition 11 because the record shows Sean had completed high school by the time he was granted probation. We consider the issue forfeited on appeal because Sean never presented his objections to the trial court.

While an appellate court may invalidate a legally defective probation condition, even without a timely objection, ordinarily objections to inapplicable or unreasonable conditions must be timely made in the trial court. (*People v. Lent* (1975) 15 Cal.3d 481 [124 Cal.Rptr. 905, 541 P.2d 545]; *In re Sheena K.* (2007) 40 Cal.4th 875, 888–889 [55 Cal.Rptr.3d 716, 153 P.3d 282]; *People v. Welch* (1993) 5 Cal.4th 228, 237 [19 Cal.Rptr.2d 520, 851 P.2d 802].) Here there is no legal defect in the probation condition. Rather, the claim is the condition was moot when imposed and thus we should strike it. In our view this is the classic matter that should have been resolved in the trial court.

A review of the probation conditions in the record clearly indicate that condition 11 was part of a standard list of conditions for juveniles who have committed offenses such as that committed by Sean. If Sean had an objection to the condition based on it being moot he could have raised it in the trial court. Further, by its own language, the condition accommodates Sean's circumstances.

As Sean points out, the record shows he has graduated from high school. The challenged condition can reasonably be read to excuse him from further compliance with the condition. It provides that he must attend school unless "officially excused from school attendance." Since Sean has graduated from high school, he has certainly been "officially excused" from any further attendance at that school. We know of no other circumstance, based on this record, which might require Sean to attend any school other than high school. Ultimately, if Sean disagrees with the continued applicability of the condition, he can certainly return to the juvenile court and seek a modification of the terms of his probation. As to this court, however, Sean has forfeited any right to complain about the challenged condition.

## DISPOSITION

The judgment is affirmed.

Nares, J., concurred.

**IRION, J.,** Dissenting.—I respectfully dissent because my colleagues have approved an unwarranted expansion of the controlling Supreme Court case law, which permits suspicionless searches in public schools only under limited circumstances. I would conclude that the assistant principal's search of Sean was unlawful because it was *not* pursuant to a valid policy of suspicionless searches and was *not* based on reasonable suspicion.

A. *The Requirement of Reasonable Suspicion Was Not Satisfied*

As my colleagues acknowledge, unless the assistant principal's search of Sean was performed as a suspicionless special needs administrative search that meets the applicable constitutional requirements, the search is governed by the normal rules for individual searches of public school students set forth in *New Jersey v. T. L. O.* (1985) 469 U.S. 325, 333 [83 L.Ed.2d 720, 105 S.Ct. 733] (*T.L.O.*). Under *T.L.O.*, a search by a public school official is permitted by the Fourth Amendment if "there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." (469 U.S. at p. 342.)

My colleagues do not attempt to argue that the search here met that standard. Indeed, it did not. According to the record, the only information that the assistant principal relied upon when deciding to conduct the search was that Sean had left and returned to campus. That information, in and of itself, does not raise a reasonable suspicion that a search of Sean's pockets would reveal contraband or any other evidence of misconduct. As our Supreme Court held in *In re William G.* (1985) 40 Cal.3d 550 [221 Cal.Rptr. 118, 709

P.2d 1287], applying the standard set forth in *T.L.O.*, knowledge that a student "was tardy or truant from class provided no reasonable basis for conducting a search of any kind." (*William G.*, at p. 566.)[1]

## B. *The High School's Policy of Suspicionless Searches Is Not Constitutionally Valid*

The question, therefore, is whether, as my colleagues contend, the case law approving suspicionless administrative searches under certain circumstances in school settings is applicable here. I conclude that it is not.

### 1. *Supreme Court Authority Approves Suspicionless Searches in Schools Only in the Context of Drug Testing Programs*

As the United States Supreme Court has explained, "[t]o be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. . . . But particularized exceptions to the main rule are sometimes warranted based on 'special needs, beyond the normal need for law enforcement.' . . . When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. . . . 'In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.' " (*Chandler v. Miller* (1997) 520 U.S. 305, 313–314 [137 L.Ed.2d 513, 117 S.Ct. 1295], citations omitted (*Chandler*).)

The Supreme Court has approved suspicionless searches in public schools *only* in the context of drug testing programs imposed on students who wish to participate in school sports or competitive extracurricular activities, and *only* to address a demonstrated drug abuse problem among the student body. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646 [132 L.Ed.2d 564, 115 S.Ct. 2386] (*Vernonia*); *Board of Ed. of Independent School Dist. No. 92 of Pottawatomie Cty. v. Earls* (2002) 536 U.S. 822 [153 L.Ed.2d 735, 122

---

[1] Case law from other jurisdictions also concludes that a student's absence from campus, during the school day, without more, does not provide reasonable suspicion to justify a search under the Fourth Amendment. (*Commonwealth v. Damian D.* (2001) 434 Mass. 725, 730 [752 N.E.2d 679, 683] ["It was pure speculation to conclude that, because Damian was out of class for a period of time during the day, he was likely to have contraband."]; *State v. B.A.S.* (2000) 103 Wn.App. 549, 553 [13 P.3d 244, 246] ["suspicion that B.A.S. had violated the closed campus rule did not provide reasonable grounds for concluding that a search would reveal evidence of that or additional violations of law or school rules"].)

S.Ct. 2559] (*Earls*). My colleagues rely on *Vernonia* and *Earls* to approve a school's program of suspicionless searches not involving drug testing. However, in a persuasive opinion, the federal Eighth Circuit Court of Appeals in *Doe v. Little Rock School Dist.* (8th Cir. 2004) 380 F.3d 349, 352 (*Doe*), rejected a public school's attempt to expand the holdings in *Vernonia* and *Earls* to justify a program of random suspicionless searches with similarities to the program at issue here. *Doe* concluded that it was not constitutionally permissible for a school to conduct searches of randomly selected classrooms in which students' pockets, purses and backpacks were searched because of a generalized concern about weapons and drugs. (*Doe*, at pp. 351, 356.)

In my view, my colleagues undertake a far reaching and unprecedented expansion of Fourth Amendment doctrine by concluding that *Vernonia* and *Earls* authorize a high school to adopt a policy subjecting students returning to campus to suspicionless searches. "The touchstone of the Fourth Amendment is reasonableness . . . ." (*Samson v. California* (2006) 547 U.S. 843, 855, fn. 4 [165 L.Ed.2d 250, 126 S.Ct. 2193].) To determine whether a program of suspicionless searches in schools is reasonable, the Supreme Court has "conducted a fact-specific balancing" of the intrusion on the student's Fourth Amendment rights against the promotion of legitimate governmental interests. (*Earls, supra,* 536 U.S. at p. 830.) The factors considered in this balancing process are the scope of the legitimate expectation of privacy at issue, the character of the intrusion that is complained of, the nature and immediacy of the governmental concern at issue, and the efficacy of the means employed for addressing that concern. (*Vernonia, supra,* 515 U.S. 646, 654–666; *Earls, supra,* 536 U.S. at pp. 830, 832, 834.) "[T]he proffered special need . . . must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." (*Chandler, supra,* 520 U.S. at p. 318.)

> 2. *The People Have Not Met Their Burden to Establish a Specific Concern Justifying the High School's Policy of Suspicionless Searches*

The Supreme Court has not hesitated to reject a program of suspicionless searches when the government has not provided evidence that the program is based on a well founded governmental concern. In *Chandler, supra,* 520 U.S. 305, the Supreme Court found unconstitutional a suspicionless testing program that required drug testing of candidates for designated state offices in Georgia. (*Id.* at pp. 308–309.) The state did not meet its burden of showing "a concrete danger demanding departure from the Fourth Amendment's main rule" because there was no "*demonstrated* problem of drug abuse" among elected officials to "shore up an *assertion* of special need for a suspicionless

general search program." (*Id.* at p. 319, italics added.) Further, the state did not demonstrate that the policy was "well designed to identify candidates who violate antidrug laws" or that it was "a credible means to deter illicit drug users from seeking election to state office." (*Ibid.*)

The People here have not met their burden to establish that Sean's high school has a special need to conduct suspicionless searches. The only evidence in the record regarding the purpose or need for the policy appears in a brief remark by the assistant principal. He testified that the goal of the policy is to "keep students that are on campus safe" and to ensure that "nobody's bringing anything on campus they shouldn't." He provided no information about what type of contraband was being targeted or whether the high school had a demonstrated problem with students leaving campus and bringing back contraband.

My colleagues assume that "[p]lainly the purpose of the policy is to prevent students who have left and returned in violation of the school rules from bringing in harmful objects such as weapons or drugs," and that the policy targets "a form of rule violation that can easily lend itself to the introduction of drugs or weapons into the school environment." (Maj. opn., *ante*, at pp. 189, 190.) However, the record contains *no* evidence that Sean's high school has a problem with weapons and drugs. Even if the court were to take judicial notice that schools generally face problems with drugs and weapons, the record contains no indication that the high school *here* has a *specific problem* with students who return to campus during the day possessing those items. (See *Vernonia, supra,* 515 U.S. 646, 649, 662–663 [student athletes targeted for drug testing because of the documented problem with drug use in that group and their role model status].) Thus, the record does not support a finding that the high school's program of suspicionless searches addresses "a concrete danger demanding departure from the Fourth Amendment's main rule." (*Chandler, supra,* 520 U.S. at p. 319.)

*Doe* rejected a similar attempt, unsupported by the record, to invoke "weapons and drugs" as a justification for suspicionless searches. (*Doe, supra,* 380 F.3d at p. 356.) "While [the school district] has expressed some generalized concerns about the existence of weapons and drugs . . . , . . . there is nothing in the record regarding the magnitude of any problems with weapons or drugs that it has actually experienced. All schools surely have an interest in minimizing the harm that the existence of weapons and controlled substances might visit upon a student population, but public schools have never been entitled to conduct random, full-scale searches of students'

personal belongings because of a mere apprehension." (*Ibid.*)[2] The federal Ninth Circuit Court of Appeals made the same point in *B.C. v. Plumas Unified School Dist.* (9th Cir. 1999) 192 F.3d 1260, in which it ruled that a random and suspicionless dog sniff search in a high school was unconstitutional. The dog sniffs were ostensibly directed at finding drugs, but the court noted that the record did "not disclose that there was any drug crisis or even a drug problem" at the high school, and thus "the random and suspicionless dog sniff search . . . was unreasonable in the circumstances." (*Id.* at p. 1268.)

Stressing that *proof of an actual need* for a program of suspicionless search is required, the Supreme Court has stated that "where the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable,' " but "where . . . public safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search." (*Chandler, supra*, 520 U.S. at p. 323.) The People here have not shown that the safety of the student body would genuinely be in jeopardy in the absence of a policy subjecting students to search when they return from off campus.

The People also have not established the *efficacy* of the policy for keeping drugs and weapons off campus. (See *Vernonia, supra*, 515 U.S. at p. 660 [inquiry includes "the efficacy" of the means selected by the government to address the identified need]; *Chandler, supra*, 520 U.S. at p. 319 [inquiring whether the policy was "well designed" and "a credible means" to meet its stated goal].) Without question, students who do not leave campus during the day can also bring contraband onto campus, either in the morning or after being truant for the beginning of day (thus qualifying as truants, but not students "return[ing]" to campus). Therefore, the high school's policy does not appear to be well designed to prevent the introduction of weapons and drugs on campus.[3]

---

[2] In contrast, the Supreme Court in *Earls* and *Vernonia* found the drug testing policies to be constitutionally valid in light of the *particularized evidence* showing a need for the drug testing policy. "In *Vernonia*, the record demonstrated that 'a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion,' 'disciplinary actions had reached "epidemic proportions," ' and 'the rebellion was being fueled by alcohol and drug abuse.' [(*Vernonia, supra*, 515 U.S. at pp. 662–663.)] The Court emphasized, moreover, that the school district had particularly compelling safety concerns because its 'athletes were the leaders of the drug culture' and 'drug use increases the risk of sports-related injury.' [(*Id.* at p. 649.)] Similarly, in *Earls*, the school district had 'presented *specific evidence* of drug use' at its schools, leading to the district court's finding that the school district was 'faced with a "drug problem" when it adopted the policy.' [(*Earls, supra*, 536 U.S. at pp. 834–835)]." (*Doe, supra*, 380 F.3d at p. 356, italics added.)

[3] In my view, the wording of the school's policy itself raises genuine questions about whether the purpose of the policy is to keep drugs and weapons out of the school. Thus, I cannot agree with my colleagues that "[p]lainly" the purpose for the policy is to keep weapons and drugs out of the school. (Maj. opn., *ante*, at p. 189.) The school's search policy is set forth in a two-sentence paragraph in the student handbook. The first sentence describes the policy.

### 3. *The High School's Policy of Suspicionless Searches Significantly Intrudes on Students' Legitimate Expectation of Privacy*

The intrusiveness of the search and high school students' legitimate expectations of privacy also lend support to a conclusion that the high school's policy of suspicionless searches is not reasonable. (*Vernonia, supra,* 515 U.S. at p. 658 [examining "the scope of the legitimate expectation of privacy at issue" and "the character of the intrusion that is complained of"].)

Admittedly, "[s]tudents in public schools do indeed have lesser expectations of privacy than people generally have in public situations, due in large part to the government's responsibilities 'as guardian and tutor of children entrusted to its care.' [Citation.] Public school students' privacy interests, however, are not nonexistent." (*Doe, supra,* 380 F.3d at p. 353.) "A search of a child's person . . . , no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." (*T.L.O., supra,* 469 U.S. at pp. 337–338, fn. omitted.) The Supreme Court has "take[n] notice of the difficulty of maintaining discipline in the public schools today" but has stated that "the situation is not so dire that students in the schools may claim no legitimate expectations of privacy." (*Id.* at p. 338.)

My colleagues conclude that the intrusion on a student's legitimate expectations of privacy in this case is minimal because the assistant principal's search of Sean involved nothing more than an emptying of Sean's pockets during which no touching occurred. I disagree, as my colleagues overlook three important points.

First, as demonstrated by what happened to Sean, the high school's policy allows the results of the search to be shared with law enforcement and used as the basis for school discipline, making the search quite intrusive, although it may not be extremely physically invasive. *Vernonia* and *Earls* considered it highly significant when assessing the intrusiveness of the drug tests that the test results were *not* shared with law enforcement or used for school discipline. (*Vernonia, supra,* 515 U.S. at p. 658; *Earls, supra,* 536 U.S. at p. 833; see also *Doe, supra,* 380 F.3d at p. 355 ["Because [the school district's] searches can lead directly to the imposition of punitive criminal sanctions, the character of the intrusions is qualitatively more severe than that in *Vernonia* and *Earls*."].)

---

The second sentence states: "Any food or beverage which is obtained while a student is out of bounds/off campus will be confiscated and returned to the student at the end of their school day." In light of this language, and absent any evidence to the contrary, the policy may in fact have been motivated by a desire to keep students from leaving campus during the day to buy food.

Second, because my colleagues seek to justify the high school's search of Sean on the ground that it was conducted pursuant to a constitutionally permissible *policy* of suspicionless searches, the inquiry is whether the *policy* sufficiently limits the intrusiveness of the searches. I would conclude that it does not. Although in Sean's case the assistant principal chose to limit the search to an emptying of pockets, the policy itself contains no such limitation. Indeed, it broadly permits searches of a student's "person, . . . possessions and vehicle," and thus authorizes searches much more extensive than what happened to Sean.

Third, in assessing whether students in this case should have a legitimate expectation of privacy that would make the high school's policy unreasonable, my colleagues appear to find it significant that "[t]he policy was written and made known to both students and parents," and "[t]he students and their parents receive notice of the policy as part of the school's behavior code." (Maj. opn., *ante*, at p. 188.) However, this fact should have no legal impact on a student's legitimate expectations of privacy. "The students are required by state law to attend school, and have not entered into a contract that incorporates the handbook or voluntarily assented to be bound by its terms. The lack of mutual consent to the student handbook makes it fundamentally different from an employee handbook, which may create an enforceable contract between an employer and employee under traditional contract principles. The [school] may not deprive its students of privacy expectations protected by the fourth amendment simply by announcing that the expectations will no longer be honored." (*Doe, supra*, 380 F.3d at p. 354.)

My final concern with the intrusiveness of the high school's policy is the significant discretion that it gives to school officials charged with administering it. Not only is the scope of the search unconstrained, the high school's written policy does *not* state that *all* students who leave and return to campus *will be* searched. Instead it states that such students are "subject to" a search. The policy therefore leaves open the possibility that school officials will decide to conduct searches only of those students returning to campus whom they suspect might possess contraband or evidence of misconduct. That sort of discretion is constitutionally impermissible. There is a risk that an official could use the policy to target a specific individual for a search even though the official does not have reasonable suspicion as required by *T.L.O., supra*, 469 U.S. 325. As explained by the Supreme Court, "[e]xceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where 'other safeguards' are available 'to assure that the individual's reasonable expectation of privacy is *not "subject to the discretion of the official in the field."* ' " (*T.L.O.*, at p. 342, fn. 8, italics added.)

Conducting the careful balancing required by the Supreme Court, I would conclude that the high school's policy is not reasonable, and thus not permissible under the Fourth Amendment.[4] I would therefore require a showing of individual suspicion as set forth in *T.L.O., supra,* 469 U.S. at pages 341–342. Because the record reveals that no reasonable suspicion was present here, I would conclude that the evidence obtained as a result of the search must be suppressed.

Appellant's petition for review by the Supreme Court was denied March 30, 2011, S190301.

---

[4] My colleagues rely heavily on *In re Latasha W.* (1998) 60 Cal.App.4th 1524 [70 Cal.Rptr.2d 886], which, citing *Vernonia, supra,* 515 U.S. 646, concluded that a policy of suspicionless metal detector search of students was constitutionally valid. I take no position on whether *Latasha W.* was correctly decided, as the holding in *Latasha W.* was based on the specific situation presented there. The constitutionality of any program of suspicionless searches depends on a balancing process with facts unique to that specific case, based on the factors set forth by the Supreme Court in the applicable case law.