Filed 1/3/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.J., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>K.J.,<br><br>　　　　Defendant and Appellant. | A147478<br><br>(Solano County<br>Super. Ct. No. J43289) |

Based upon an anonymous student tip that K.J. was carrying a loaded gun on school grounds, the principal of K.J.'s high school removed him from class and escorted him to the hallway where a police officer assigned as a school resource officer and a backup police officer were waiting. A search of K.J.'s person revealed a semi-automatic handgun and a bullet magazine containing several rounds of ammunition.

Following a combined motion to suppress evidence and jurisdictional hearing, the juvenile court sustained a petition alleging appellant possessed a weapon on school grounds. On appeal, K.J. contends his motion to suppress should have been granted because he was detained and searched without reasonable suspicion. We disagree and affirm the judgment.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

The Solano County District Attorney petitioned to have appellant declared a ward of the court after appellant was found to be carrying a loaded weapon at school.[1] Appellant filed a motion under Welfare and Institutions Code section 700.1 to suppress evidence related to search and seizure, including the handgun, ammunition, and statements he made at the time of the search.

At the hearing on appellant's motion, William Cushman, the assistant principal of Fairfield High School, testified that at approximately 1:30 p.m. on December 17, 2015, he received a text message from a student, alerting him that a student with a gun was at school. Vice Principal Cushman knew the identity of the student who contacted him, but declined to reveal her identity due to the student's fear of retaliation. Consequently, the parties stipulated that the student would be treated as an anonymous tipster.

The actual text read: " 'IDK if school is out RN, but there's a guy with a loaded gun at Yeto.' " "Yeto" referred to Sam Yeto High School a "credit recovery school" located on the Fairfield High campus. Vice Principal Cushman interpreted the text as stating, "I don't know if school out right now, but there's a kid with a loaded gun on Yeto campus."

After advising his secretary to call the police, Vice Principal Cushman immediately went to the Yeto campus, to report the message to that school's principal, Sherry McCormick. Shortly after he arrived at Yeto, Vice Principal Cushman was met by Fairfield Police Officer, Paula Gulian, the campus resource officer for Fairfield High.

Officer Gulian testified that she received a report from Vice Principal Cushman that a male student had a gun at the Yeto campus. As per police protocol, Officer Gulian called for a backup officer. In the meantime, Officer Gulian told Vice Principal Cushman to contact the student tipster for more information. At approximately 1:40

---

[1] Felony possession of a firearm in a school zone is a violation of Penal Code section 626.9, subdivision (b). Appellant was also charged with felony possession of a firearm by a minor (Pen. Code, § 29610) and misdemeanor possession of live ammunition by a minor (Pen. Code, § 29650).

2

p.m., Vice Principal Cushman called the student tipster. The student seemed "anxious" and "surprised" to receive a call from Vice Principal Cushman, but she responded to his questions. The student told Vice Principal Cushman that she had received a message via the social media application, SnapChat, with a video showing a student, sitting in a classroom, displaying a gun and a magazine clip.

At approximately 1:42 p.m., Vice Principal Cushman saw the video. He believed, but was not certain, that he saw the video before the police went to talk with appellant in his classroom. Even without the video, Vice Principal Cushman felt "sure" that they "had the right person based on the description" he received from the student tipster. That description provided the suspect's gender, race, hair style. The student tipster said she knew who the suspect was, but did not know his name. The student tipster also said that the suspect wore dread locks and previously attended Fairfield High.

Officer Gulian testified that based on the information provided by the student tipster, Vice Principal Cushman and Principal McCormick came up with the names of two students who fit the description. When Vice Principal Cushman gave the names of the suspects to the student tipster, she identified appellant as the student in the video. Once Officer Quinn arrived as backup, he, along with Officer Gulian and Principal McCormick, went to appellant's classroom. Officer Gulian testified that she had not viewed the SnapChat video before going to appellant's classroom. Officer Gulian directed Principal McCormick to escort appellant from the classroom. When the principal and appellant emerged from the classroom, Officer Gulian removed appellant's backpack and handcuffed him.

Officer Gulian's search of appellant's person uncovered a bullet magazine in the left front pocket of his jeans; Officer Quinn found a nine millimeter Taurus semi-automatic in the shorts appellant was wearing under his jeans. The firearm was not loaded, but the magazine contained seven rounds of ammunition.

## II. DISCUSSION

Appellant contends that the detention and search violated his Fourth Amendment right to be free from unreasonable search and seizure because Officer Gulian did not have reasonable suspicion that criminal activity was afoot or that he was armed and dangerous.

### A. *Legal Standards Governing Searches and Seizures on School Premises*

The Fourth Amendment protects students on a public school campus against unreasonable searches and seizures. (*In re Randy G.* (2001) 26 Cal.4th 556, 567 (*Randy G.*); *In re William G.* (1985) 40 Cal.3d 550, 561 (*William G.*); *In re Sean A.* (2010) 191 Cal.App.4th 182, 186 (*Sean A.*).) "A search of a child's person or of a closed purse or other bag carried on her person, no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy." (*New Jersey v. T.L.O.* (1985) 469 U.S. 325, 337-338, fn. omitted (*T.L.O.*).) It is well settled that the actions of public school officials are "subject to the limits placed on state action by the Fourteenth Amendment." (*T.L.O., supra,* 469 U.S. at p. 334; *William G., supra,* 40 Cal.3d at pp. 558-559.) Public school officials "must therefore respect the constitutional rights of students in their charge against unreasonable searches and seizures." (*William G., supra,* 40 Cal.3d at p. 561.) Unless "special needs, beyond the normal need for law enforcement," make constitutional requirements "impracticable." (*T.L.O., supra,* 469 U.S. at p. 351 (conc. opn. of Blackmun, J.)), a school official's conduct is subject to the same constitutional standards as that of any other government official. Such " '[s]pecial needs' exist 'in the public school context.' " (*Randy G.*, *supra,* 26 Cal.4th at p. 565, quoting *Vernonia School District 47J v. Acton* (1995) 515 U.S. 646, 653 (*Vernonia*).)

In practice, a public school student's legitimate expectation of privacy is balanced against the school's obligation to maintain discipline and to provide a safe environment for all students and staff. (*T.L.O., supra,* 469 U.S. at p. 339; *In re Cody S.* (2004) 121 Cal.App.4th 86, 90 (*Cody S.*).) Accordingly, a school official may detain a student for questioning on campus, without reasonable suspicion, so long as the detention is not arbitrary, capricious, or for the purpose of harassment. (*Randy G., supra,* 26 Cal.4th at p. 565.) A school official may search a student's person and personal effects based on "a

reasonable suspicion that the search will disclose evidence that the student is violating or has violated the law or a school rule." (*Cody S., supra,* 121 Cal.App.4th at p. 91.) For purposes of Fourth Amendment analysis, "school officials" include police officers such as Officer Gulian who are assigned to high schools as resource officers. (*In re William V.* (2003) 111 Cal.App.4th 1464, 1471 (*William V.*).)

"On appeal from a ruling denying a motion to suppress evidence, we 'exercise our independent judgment to determine whether, on the facts found by the court, the search was reasonable under the Fourth Amendment [of the United States Constitution (the Fourth Amendment)].' [Citation.] If any findings of fact are challenged, we apply a substantial evidence standard of review. [Citation.]" (*Sean A., supra,* 191 Cal.App.4th at p. 186.)

## B. *The Detention Did Not Violate the Fourth Amendment*

Appellant contends that the "arbitrary and capricious" standard of *Randy G.* does not apply because he was detained by two police officers, but only one was an acting campus resource officer. He further argues that *William V.,* which extends *Randy G.* to campus resource officers, does not apply because it involved a search, as opposed to a detention.

Preliminary, appellant's attempt to distinguish the standards applicable to searches and seizures fails. Although *William V.* involved a search rather than a seizure by a campus resource officer, "the test for assessing the reasonableness of official conduct under the Fourth Amendment is essentially the same: 'it is necessary "first focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search or seizure entails." ' (*Terry v. Ohio* [(1968)] 392 U.S. [1,] 20-21.)" (*Randy G., supra,* 26 Cal.4th at p. 566.) In *Randy G.* our supreme court noted that this " 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for the children.' (*Vernonia, supra,* 515 U.S. at p. 656.)" (*Randy G., supra,* 26 Cal.4th at p. 566.)

5

In *Randy G., supra,* 26 Cal.4th 556, the court refused to apply the reasonable suspicion standard used for school searches to detentions because, among other things, "[d]ifferent interests are implicated by a search than by a seizure (*Horton v. California* (1990) 496 U.S. 128, 133), and a seizure is 'generally less intrusive' than a search. (*Segura v. United States* (1984) 468 U.S. 796, 806 . . . .)" (*Randy G., supra,* 26 Cal.4th at p. 567.) Instead, the court concluded that "detentions of minor students on school grounds do not offend the Constitution, so long as they are not arbitrary, capricious, or for the purposes of harassment." (*Randy G., supra,* 26 Cal.4th at p. 567.)

We reject appellant's contention that we should not apply the arbitrary and capricious standard because, although Officer Gulian qualified as a campus resource officer, Officer Quinn did not share this status. This distinction places form over substance and ignores the resource officer's function at the school, as well as the special nature of a public school.

In *William V., supra,* 111 Cal.App.4th 1464, the court refused to make a similar arbitrary distinction. There, the defendant argued that a specially assigned police officer was not a school official and thus was required to have probable cause, rather than merely a reasonable suspicion, to conduct a search. (*Id.* at p. 1467.) In rejecting this argument, the court explained: "We too see no reason to distinguish for this purpose between a non-law-enforcement security officer and a police officer on assignment to a school as a resource officer." (*Id.* at p. 1471.) The *William V.* court refused to focus on "the insignificant factor of who pays the officer's salary, rather than on the officer's function at the school and the special nature of a public school." (*Ibid.*)

Relying on the reasoning of *T.L.O., William V.* focused on "balancing the importance of maintaining an appropriate educational environment with the privacy interests of students . . . ." (*William V., supra*, 111 Cal.App.4th at p. 1472.) The *William V.* court also found it unimportant "[t]hat some officials enforcing the school rules may have a greater or lesser degree of training in constitutional law thus is not determinative of the standard to be applied." (*Ibid.*)

6

Here, Officer Gulian was a school resource officer. As part of police protocol, she called for a backup officer. The relationship between a student and campus resource officer is no different than that between a student and the backup officer merely because one is assigned to work at the school and the other is not. The distinction between the campus resource officer and the backup officer called to assist focuses on job classification, rather than on the campus officer's function at the school and the special nature of the public school. As explained in *William V., supra,* 111 Cal.App.4th 1464, citing *William G.*, *supra*, 40 Cal.3d 550, 563: " ' " 'When society requires large groups of students, too young to be considered capable of mature restraint in their use of illegal substances or dangerous instrumentalities [to congregate in the public schools], it assumes a duty to protect them from dangers posed by anti-social activities—their own and those of other students—and to provide them with an environment in which education is possible. To fulfill that duty, teachers and school administrators must have broad supervisory and disciplinary powers." ' The fulfillment of the school's duty should not be dependent on whether the school district or the city employs the security officer. As noted in *In re Randy G., supra*, 26 Cal.4th at pages 568-569, drawing such a distinction might force school districts to employ private security guards rather than certified police officers, who may have superior training, which would hardly enhance protection of the students' Fourth Amendment rights." (*William V., supra*, 111 Cal.App.4th at p. 1471.)

The distinction suggested by appellant could result in campus resource officers not calling for backup because the responding officers are not specially assigned to the school. This not only has the potential to endanger campus resource officers, but also threatens the safety of the students they are there to protect. Moreover, presumably campus resource officers and responding backup officers have the same specialized training in Fourth Amendment jurisprudence, such that protection of students' Fourth Amendment rights would be the same regardless of the officers' assignment. That a police officer assigned to a high school as a resource officer is assisted by a backup from a non-campus resource officer is not determinative of the standard to be applied.

7

For purposes of Fourth Amendment analysis, "school officials," include police officers such as Officer Gulian, who are assigned to high schools as resource officers (*William V., supra,* 111 Cal.App.4th at pp. 1470-1471), as well as the backup officers who are called to assist them.

Here, the detention of appellant was lawful under the *Randy G.* standard. Substantial evidence supported the juvenile court's express findings that Officer Gulian was acting as a school officer and that the detention occurred on school property and supported the court's implied finding that the detention was neither arbitrary, capricious or for the purpose of harassment. Officer Gulian testified that she was assigned as a school resource officer whose duties included "handling any type of crimes that happen on campus." She testified that prior to the detention, she had received a report from Vice Principal Cushman that a male student at Yeto had a gun. In balancing the grave threat to the lives of students and staff posed by the threat of a student carrying a firearm on school grounds against the minimally intrusive nature of removing a student from class, appellant's detention was lawful.

In another attempt to avoid the arbitrary and capricious standard, appellant argues that his detention was more intrusive than the one at issue in *Randy G.* In *Randy G.* a security guard called a student out into the hall to ask questions about a possible rule violation. (*Randy G., supra,* 26 Cal.4th at pp. 560-561.) Appellant argues that here, in contrast, he was "escorted out his class by the principal to awaiting police officer[s] who immediately removed his backpack, placed him in handcuffs, and searched his person."

Handcuffing a suspect substantially increases the intrusiveness of a stop and is not part of a typical investigatory detention. (*Washington v. Lambert* (9th Cir.1996) 98 F.3d 1181, 1188; *People v. Stier* (2008) 168 Cal.App.4th 21, 27 (*Stier*).) Nevertheless, it has been held that stopping a suspect at gunpoint, handcuffing him, and placing him in a patrol car does not automatically elevate a seizure into an arrest requiring probable cause. (*Gallegos v. City of Los Angeles* (9th Cir. 2002) 308 F.3d 987, 991-992; *People v. Celis* (2004) 33 Cal.4th 667, 675; *People v. Soun* (1995) 34 Cal.App.4th 1499, 1517-1520.) This is because an officer may take reasonably necessary steps to protect his or her safety

8

and to maintain the status quo during a detention. (*Celis, supra,* 33 Cal.4th at p. 675.) The issue is whether the methods used during a detention were reasonably necessary under all of the circumstances of the detention. (*Stier, supra,* 168 Cal.App.4th at p. 27; *In re Antonio B.* (2008) 166 Cal.App.4th 435, 441.)

Examining the circumstances present at the time of the detention here, including the facts known to officers, we conclude the conduct by law enforcement authorities was reasonable. Officer Gulian explained that she had the principal retrieve appellant from class because, in her experience, if a student did have a gun, it was more likely that a shoot-out could happen if an officer entered the classroom. Officer Gulian further testified that she immediately grabbed appellant's backpack and put him in handcuffs as a safety measure to make sure that, if he did have a gun, he would not be able to grab the weapon. She explained that it was police procedure to control a suspect's hands when a gun is involved. Officer Gulian testified that her decision to place appellant in handcuffs before talking to him was made to ensure the safety of the students, staff, and officers. Balancing the nature of the threat against appellant's Fourth Amendment interests, the officers acted reasonably under the circumstances.

## C.      *The Search Did Not Violate the Fourth Amendment*

Appellant does not contest the scope of the search. Instead, he contends the search was not " 'justified at its inception' " because there were no "reasonable grounds" for suspecting that he was carrying a gun.

A search is " 'justified at its inception' " if under "ordinary circumstances" the information constituted "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." (*T.L.O., supra,* 469 U.S. at pp. 341-342.) Undoubtedly reasonable grounds existed for suspecting that the search would turn up evidence that appellant was carrying a gun. The circumstances, far from being ordinary, were in fact extraordinary and rendered the need to search all the more compelling and immediate. Police had been informed by the vice principal that a student texted him to report that appellant was displaying a gun at school. This information presented an extreme danger that called for

9

an immediate response. In our view, the juvenile court properly concluded that the search was reasonable under the circumstances, especially since the search itself was minimally intrusive "in light of the . . . nature of the infraction" (fn. omitted), and "objectives of the search." (*T.L.O., supra,* 469 U.S. at p. 342.)

Appellant nonetheless insists that the search was not "justified at its inception." He reasons that the information leading to the search came from an anonymous source and was therefore unreliable because there were no means of testing the informant's knowledge or credibility. On this point, he relies principally on *Florida v. J.L.* (2000) 529 U.S. 266 (*J.L.*), a case arising outside the school context, in which the high court addressed "whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person," and concluded it is not. (*Id.* at p. 268.)

In *J.L.,* an anonymous caller reported to the police that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." (*J.L., supra,* 529 U.S. at p. 268.) There was no audio recording of the tip and nothing was known about the informant. Acting on the tip, two police officers arrived at the bus stop and saw three black males, one of whom was wearing a plaid shirt. (*Ibid.*) "Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements . . . . One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket." (*Ibid.*)

The high court acknowledged that "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " (*J.L., supra,* 529 U.S. at p. 270.) On the facts before it, however, the high court concluded that "the tip lacked the moderate indicia of reliability" required to sustain the stop because the anonymous call concerning J.L. "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. . . . The reasonableness of official suspicion must be measured by what the officers knew before they conducted their

10

search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." ( *Id.* at p. 271.)

*J.L.* is not controlling here. To begin with, in *J.L.,* unlike here, nothing was known about the informant who "neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." (*J.L., supra,* 529 U.S. at p. 271.) In contrast, the anonymous tip here came from a student at Fairfield High, who sent a text message to the vice principal, advising him that there was "a guy with a loaded gun" at the Yeto campus. Also, when the vice principal called the student tipster for additional information, she told him that she had received a video, from a social media application, that showed a student sitting in a classroom, displaying a gun and a magazine clip. The student tipster said she knew who the suspect was, but she did not know his name. She added that the suspect wore dread locks and previously went to Fairfield High. Based on this information Vice Principal Cushman and Principal McCormick were able to come up with the names of two students who fit the description. When given the names of the suspects, the student tipster identified appellant as the student in the video. These circumstances evince far more than the "moderate indicia of reliability" found lacking in *J.L.*

Yet, appellant insists that the search was not based on reasonable suspicion because neither Vice Principal Cushman nor Officer Gulian watched the video before he was searched. However, Vice Principal Cushman testified that even without the video, he felt "sure" that they "had the right person based on the description" he received from the student tipster. That description included the suspect's gender, race, hair style, as well as his status as a former student at Fairfield High. Under these circumstances, any failure to watch the video prior to contacting appellant did not diminish the reliability of the information provided by the student tipster.

Nevertheless, *J.L.* itself acknowledged that "[f]irearms are dangerous, and extraordinary dangers sometimes justify unusual precautions," as well as the possibility that "the danger alleged in an anonymous tip might be so great as to justify a search even

11

without a showing of reliability." (*J.L., supra,* 529 U.S. at 272-273.) Accordingly, the high court specifically limited its holding, stating, "Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as . . . schools, [citation], cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere." (*Id.* at p. 274.) Thus, even if we were to view the indicia of reliability of the informant's tip here to be marginal, we would still conclude that the search was reasonable based on the "extraordinary dangers" presented by the possibility that a student was brandishing a handgun at school. (*J.L., supra,* 529 U.S. at p. 272.)

Appellant's search was reasonable and consistent with the Fourth Amendment.

### III. DISPOSITION

The judgment is affirmed.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

13

Trial Court:                    Solano County Superior Court


Trial Judge:                    Hon. Donna Stashyn


Counsel for Appellant:          Eileen Manning-Villar


Counsel for Respondent:         Kamala D. Harris
                                Attorney General of California
                                Gerald A. Engler
                                Chief Assistant Attorney General
                                Jeffrey M. Laurence
                                Senior Assistant Attorney General
                                Eric D. Share
                                Supervising Deputy Attorney General
                                Ronald E. Niver
                                Deputy Attorney General